**CHANNEL EQUIPMENT CO., INC., Appellant,**

v.

**COMMUNITY STATE BANK, Appellee.**

and

**CSR Sales & Rentals, Inc., f/k/a CSR–Capital Sales & Rentals, Inc., Appellant,**

v.

**Community State Bank, Appellee.**

Nos. 03–98–00255–CV, 03–98–00256–CV.

Court of Appeals of Texas, Austin.

June 30, 1999.

Thomas J. Walthall, Jr., The Gardner Law Firm, P.C., San Antonio, for appellant.

W. Brewster McCracken, Bracewell & Patterson, L.L.P., Austin, for appellee.

Before Justices JONES, B.A. SMITH and YEAKEL.

J. WOODFIN JONES, Justice.

Channel Equipment Company, Inc. and CSR Sales & Rentals, Inc., f/k/a CSR–Capital Sales & Rentals, Inc. (collectively "Plaintiffs") received payment from the same third party via separate checks drawn on an account at Community State Bank ("the Bank"). The Bank returned the checks marked "not sufficient funds," but not before the statutory "midnight deadline" had passed. *See* Tex. Bus. & Com.Code Ann. (hereinafter "Code") § 4.104(10) (West Supp.1999). Plaintiffs sued the Bank, claiming it was strictly liable on the checks pursuant to section 4.302 of the Code. *See id.* § 4.302. The Bank responded by asserting, inter alia, that any further payment on the checks would constitute unjust enrichment and double recovery because the debts underlying both checks had been satisfied. On cross-motions for summary judgment, the trial court rendered summary judgment for the Bank in both causes. Plaintiffs appeal from these orders, raising three basic issues: (1) whether they established as a matter of law their right, as payees of the checks, to recover the face amount from the Bank pursuant to section 4.302 of the Code; (2) whether the Bank's arguments relating to the applicability of Federal Reserve regulations are properly raised on appeal; and (3) whether the Bank had established its right to summary judgment as a matter of law. We will affirm the judgments.

## FACTUAL AND PROCEDURAL BACKGROUND

The facts material to a resolution of this dispute were stipulated by the parties below. Between October 1995 and February 1997, Plaintiffs leased heavy equipment to, and performed related services for, Behrens Construction, Inc. ("Behrens"). Plaintiffs maintained open accounts for Behrens, regularly invoicing the company for services rendered. In the fall of 1996, Behrens delivered checks for $60,344.09

and $62,082.46 to Channel and CSR, respectively, as payment for obligations reflected in August 1996 invoices. The checks were drawn on Behrens's account with the Bank. On October 17, 1996, Plaintiffs deposited both checks into a joint account at First Prosperity Bank in Webster, Texas. After circulating through First National Bank of Houston and the Federal Reserve Bank of Houston, the checks were presented to the Bank by the Federal Reserve Bank of San Antonio prior to 3:00 p.m. on Friday October 18, 1996. The Bank returned the checks marked "not sufficient funds" on Tuesday, October 22.

After receiving notice that the checks would not be paid, Plaintiffs took steps to recover payment from Behrens for the August 1996 invoices by asserting mechanic's lien rights. The money garnered through the mechanic's liens "fully satisfied the August 1996 invoices." Having satisfied the August invoices, Plaintiffs continued to lease equipment to and perform services for Behrens. In rendering these services, Plaintiffs accrued additional debts from Behrens that now remain unsatisfied. Currently, Behrens's unsatisfied debt to each plaintiff exceeds the value of the respective checks.

Plaintiffs sued the Bank pursuant to section 4.302 of the Code seeking to recover the value of the checks deposited on October 17, 1996. After a brief period of discovery, both Plaintiffs and the Bank filed motions for summary judgment. Without specifying the grounds on which it relied, the trial court granted the Bank's motions and denied Plaintiffs' motions.

## DISCUSSION

■■■ In reviewing a summary judgment in which the trial court has not provided the basis for its decision, we must review each ground asserted in the motion and affirm the trial court's judgment if any of these grounds is meritorious. See Star-Telegram, Inc. v. Doe, 915 S.W.2d 471, 473 (Tex.1995); Rogers v. Ricane Enters., Inc., 772 S.W.2d 76, 79–80 (Tex.1989). The standards by which we review summary judgments are well established: (1) the movant for summary judgment has the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law; (2) in deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true; and (3) every reasonable inference must be drawn in favor of the non-movant and any doubts resolved in its favor. See Nixon v. Mr. Property Mgmt. Co., 690 S.W.2d 546, 548–49 (Tex.1985). When the movant relies on an affirmative defense, the summary judgment evidence must establish each element of the defense as a matter of law. See Johnson & Johnson Medical, Inc. v. Sanchez, 924 S.W.2d 925, 927 (Tex.1996).

In their respective motions for summary judgment, Plaintiffs asserted that Texas courts have interpreted section 4.302 of the Code to render payor banks that fail to return a check by the applicable midnight deadline strictly liable for the amount of the check. Since the stipulated facts indicate that the Bank missed its midnight deadline,[1] Plaintiffs argue that, absent evidence of fraud or breach of presentment warranty—the only available defenses according to subsection (b) of section 4.302—

---

1. Although the Bank stipulates that the checks were not returned by the midnight deadline, it also asserts that the midnight deadline was superseded by Federal Reserve Operating Circular 8, which extended the statutory deadline for returning the checks. See Code § 4.103(a), (b). The Bank did not raise this issue in its motion for summary judgment, however. Rather, the Bank argued in its motion that "regardless of the timeliness of [its]

notice ... principles of justice, equity and good conscience demand that plaintiff[s] take nothing." Because we affirm the trial court's grant of summary judgment on that basis, we do not reach Plaintiffs' second issue relating to precisely when the Bank was obligated to return the checks. In effect, we assume without deciding that the midnight deadline applies.

the Bank is liable for the amount of the checks. *See* Code § 4.302(b). In both its Second Amended Answer and the Motion for Summary Judgment granted by the trial court, the Bank urged that equitable considerations must be weighed in determining the liability of a payor bank for the value of a check that it failed to return by its midnight deadline. Since Plaintiffs stipulated that the debts underlying their checks had been satisfied through the filing of mechanic's liens, the Bank asserts that forcing it to pay Plaintiffs for the full amount of the checks would violate equitable principles of unjust enrichment, double recovery, and mitigation of damages.

▇ This Court has previously recognized that summary judgment based on equitable principles is particularly dangerous because neither the parties nor the trial court has clear guidelines for determining the materiality of any facts that remain in dispute. *See Fleetwood v. Med Ctr. Bank,* 786 S.W.2d 550, 556–57 (Tex. App.—Austin 1990, writ denied). Thus, we have urged trial courts to be particularly cautious in utilizing equitable discretion where the summary judgment record is incomplete or controverted. *See id.* at 557. Nonetheless, the use of equity at the summary judgment stage may be appropriate where the facts are fully developed and clearly established. *See Elias v. Manis,* 292 S.W.2d 836, 838 (Tex.Civ. App.—Beaumont 1956, writ ref'd). In the present case, all material facts were stipulated by the parties, rendering consideration of equitable principles appropriate at the summary judgment stage.

Having recognized that the use of equitable principles to render summary judgment may be appropriate in cases like this one, we must still determine the extent to which Texas courts may properly apply principles of equity in fixing the liability of payor banks for checks for which they are accountable pursuant to section 4.302 of the Code. As a general matter, the Code provides that "[u]nless displaced by the particular provisions of this title, the prin-

ciples of law and equity . . . shall supplement its provisions." Code § 1.103. In construing this provision, the Texas Supreme Court has recognized a role for equitable principles in the application of Chapter Four by granting payor banks an equitable right to restitution for mistaken payments. *See Bryan v. Citizens Nat'l Bank,* 628 S.W.2d 761, 764 (Tex.1982). But the court limited the use of that equitable right so that it would not conflict with the provisions or principles of Chapter Four. *See id.; Miller–Rogaska, Inc. v. Bank One, Texas, N.A.,* 931 S.W.2d 655, 662 (Tex.App.—Dallas 1996, no writ). The plain language of section 1.103 constrains our present inquiry just as it constrained the supreme court in its discussion of a bank's right to restitution for mistaken payments. Thus, we begin with a brief review of the principles established by Chapter Four to regulate the payment of checks by Texas banks, in order to define parameters for the proper use of equitable principles within that context.

In the check-processing scheme established by Chapter Four, the burden of determining whether a deposited check is valid and payable ultimately falls on the bank on which the check is drawn, defined by Chapter Four as the "payor bank." *See* Code §§ 4.105(3) (defining "payor bank" as a "drawee" of a draft), 4.104(8) (defining "drawee" as one ordered to make payment on a draft). Chapter Four provisionally assumes that when a check is deposited for payment, that check will be paid by its drawer. *See* Barkley Clark & Barbara Clark, *The Law of Bank Deposits, Collections and Credit Cards* § 6.01(1) (5th ed.1999) (hereinafter "Clark & Clark"); Code §§ 4.201(a), .214(a), .215(a)(2), .301. Based on this assumption, the payee's bank provisionally places the value of the check into the payee's account and forwards the check to a clearinghouse bank for collection. *See* Clark & Clark, *supra,* § 6.01(1). The clearinghouse bank provisionally shifts the value of the check from the clearinghouse account of the pay-

or bank to the clearinghouse account of the payee's bank. *See id.* Unless the payor bank revokes the provisional clearinghouse settlement either by returning the check to the payee's bank marked "not sufficient funds" or sending written notice of dishonor, *see* Code § 4.301, the provisional settlement becomes final after passage of the midnight deadline. *See* Code § 4.215(a)(3) ("An item is finally paid by a payor bank when the bank has ... made a provisional settlement for the item and failed to revoke the settlement in the time and manner permitted by statute, clearing-house rule, or agreement."). The midnight deadline is defined as midnight on the banking day following the banking day on which a payor bank received the relevant item.[2] *See id.* § 4.104(10). Pursuant to section 4.302, payor banks are "accountable for" the amount of checks and other demand items that have not been paid, returned, or dishonored by the midnight deadline. *See id.* § 4.302(a).

By making payor banks accountable for the value of checks that they have not returned prior to the midnight deadline, section 4.302 reinforces the overall regulatory order established by Chapter Four with respect to the payment of checks. *See Starcraft Co. v. C.J. Heck Co. of Tex., Inc.,* 748 F.2d 982, 986 (5th Cir.1984). This accountability principle injects an element of certainty into the check collection process, certainty that in turn instills a degree of stability. *See id.* Banks are able to rely on the fact that after the midnight deadline has passed, checks will be paid—either by the drawee or the payor bank. In addition to reinforcing the order and certainty of Chapter Four's regulatory scheme, the rule provides a disincentive to payor banks that might otherwise seek to protect the credit of their customers who write checks without the funds to pay them. Absent the rule, banks would be able to delay the check payment process to protect a favored customer at the expense of that customer's creditors. By making payor banks accountable for checks on which they do not take action before the midnight deadline, section 4.302 discourages such action. *See id.* In determining whether equitable principles may play a role in the application of section 4.302, section 1.103 requires that we refrain from interfering with these policy goals.

■ In the present case, the Bank maintains that allowing the use of equitable principles to determine whether payor banks are liable under section 4.302 will not undermine the policies of the section. We disagree. Instead, we interpret both Texas case law and the language of section 4.302 to hold payor banks strictly accountable for the value of checks that they fail to return by their midnight deadline. As expressly provided by section 4.302, the liability of payor banks is subject only to defenses related to breach of a presentment warranty and fraud. *See* Code § 4.302(b). In arguing that payor banks are not strictly liable under section 4.302, the Bank points out that comment three to the section states that "decisions that hold an accountable bank's liability to be 'absolute' are rejected." *See id.* § 4.302, cmt. 3. We agree with the Bank that such decisions are rejected, but believe that they are rejected only to the extent that they disapprove of the defenses expressly provided in subsection (b) of the provision. At least one Texas court has held that the accountability of payor banks under section 4.302 does not depend on a showing that the check that serves as the basis for the bank's liability is enforceable. *See New Ulm State Bank v. Brown,* 558 S.W.2d 20, 25 (Tex.Civ.App.—Houston [1st Dist.] 1977, no writ). Strict accountability also coincides with the previously described policies underlying section 4.302, chiefly the imposition of order and certain-

**2.** The midnight deadline acts as a default deadline, which may be modified by federal clearinghouse rules, federal regulations, or mutual agreement. *See* Code §§ 4.103, .215(a)(3).

ty in the banking sector. For these reasons, we interpret section 4.302 to hold payor banks strictly accountable for the value of checks that they fail to return by their midnight deadline, subject only to the defenses of fraud and breach of presentment warranty expressly set forth by section 4.302(b).[3]

The Bank urges us to follow *Starcraft*, which applied equitable principles to hold that a payor bank was not obligated to account for the value of a check despite failing to return the check by the midnight deadline. *See* 748 F.2d at 992. In that case, C.J. Heck Company delivered a check to Starcraft Company as payment against Heck's open merchandise account. After Starcraft deposited the check for collection, Heck notified the payor bank to stop payment. The payor bank stopped payment, but held the check past its midnight deadline, triggering the accountability rule of section 4.302. Starcraft not only sued Heck on the underlying debt, but also sued the payor bank pursuant to section 4.302. Prior to trial, Starcraft and Heck reached a settlement that included a mutual release from all claims; the suit against the payor bank proceeded, however, resulting in a judgment for Starcraft for the amount of the check.

While recognizing the importance of certainty in banking operations, a split panel of the Fifth Circuit, applying Texas law, reversed the judgment of the trial court and remanded the cause for entry of judgment in favor of the payor bank. The court began with the premise that "the [payor] bank's liability must have some connection with the underlying debt" represented by the check. *Starcraft*, 748 F.2d at 987. The court then held that the mutual release of all claims included in the settlement between Starcraft and Heck constituted settlement of Heck's underlying debt to Starcraft. *Id.* at 988. Since Heck had given consideration for the mutual release, it would be entitled to restitution from Starcraft in the event that Starcraft received additional payment for the underlying debt from the payor bank.[4] *Id.* at 989. To avoid circularity of recovery, the court held that the payor bank was entitled by the doctrine of equitable subrogation "to assert Heck's equities and defenses to extinguish Starcraft's claim." *Id.* at 990.

We disagree with the *Starcraft* court to the extent that its reasoning enables payor banks to use equitable principles to contest their accountability under section 4.302 for checks that they have failed to return by their midnight deadline. Indeed, we believe that such reasoning could "produce endless mischief" by undermining the order and certainty that section 4.302 was designed to provide. *See Starcraft*, 748 F.2d at 995 (Timbers, J., dissenting); *see also* Clark & Clark, *supra*, § 6.02[2][n] (asserting that *Starcraft* "represents a classic example of judicial legislation, where principles of 'restitution' and 'equitable subrogation' are used to obliterate a precise UCC rule that imposes strict liabil-

---

**3.** We note that other jurisdictions around the country have reached similar conclusions. *See, e.g., Citizens Fidelity Bank & Trust Co. v. Southwest Bank & Trust Co.*, 238 Neb. 677, 472 N.W.2d 198 (1991); *Town & Country State Bank v. First State Bank*, 358 N.W.2d 387 (Minn.1984); *Northwestern Nat'l Ins. Co. v. Midland Nat'l Bank*, 96 Wis.2d 155, 292 N.W.2d 591 (1980); *Kirby v. First & Merchants Nat'l Bank*, 210 Va. 88, 168 S.E.2d 273 (1969); *State & Sav. Bank v. Meeker*, 469 N.E.2d 55 (Ind.Ct.App.1984); *see also* James J. White & Robert S. Summers, *Uniform Commercial Code* 615 (4th ed. 1995) ("[W]here a payor bank misses its midnight deadline, 4–302(a) creates strict liability that holds the payor accountable for the amount of the item.").

**4.** The court concluded: "Starcraft is entitled to recover the amount of the check from the Bank who is entitled to the same amount from Heck. Heck in turn is entitled to reclaim its payment from Starcraft based upon principles of restitution. Texas courts have characterized such a series of claims as a 'useless circuity of action.'" *Starcraft*, 748 F.2d at 989 (quoting *Phillips Pipe Line Co. v. McKown*, 580 S.W.2d 435, 440 (Tex.Civ. App.—Tyler 1979, writ ref'd n.r.e.)).

ity on a tardy [payor] bank"). The *Starcraft* court's assumption that a payor bank's liability under section 4.302 must be connected to the debt underlying the value of the check conflicts both with the language of 4.302 and the holding in *New Ulm State Bank.* The language of 4.302 neither refers to nor assumes the existence of a debt in rendering payor banks accountable for checks on which they fail to act by their midnight deadline. In fact, *New Ulm State Bank* recognized that the accountability of payor banks for checks is determined independently from the issue of whether that item is enforceable against its drawer. *See New Ulm State Bank,* 558 S.W.2d at 25. Were this not the case, payor banks would not be obligated to pay checks given as gifts that are returned after the midnight deadline because such items would be neither enforceable against the drawer nor indicative of an underlying obligation. *See Starcraft,* 748 F.2d at 993 (Timbers, J., dissenting). Allowing an inquiry into the nature of the debt underlying every check that a payor bank failed to return by the midnight deadline would undermine the order and certainty that Chapter Four strives to provide in the banking sector. We therefore decline to recognize such a broad role for equitable principles in the application of section 4.302.

■ Although we hold that equitable principles may in no way interfere with the strict accountability of payor banks established by section 4.302, we believe such principles may be used to determine the *amount* of a payor bank's liability. In this sense, we are persuaded by the approach of the Indiana Court of Appeals in *State & Savings Bank v. Meeker,* 469 N.E.2d 55 (Ind.Ct.App.1984). In that case, the court held a payor bank strictly liable for the amount of a check that it failed to return by the midnight deadline. *See id.* at 59 ("If banks were allowed to retain instruments beyond the time specified in the U.C.C. and avoid liability on equitable grounds, finality and certainty would not

exist in the business world."). The court went on, however, to hold that the amount of liability could be reduced by the amount of any other recovery obtained by the payee of the check. *See id.* ("An issue of material fact must be resolved to determine if, and to what extent, [the payee's] damages have been mitigated."). Of particular interest in that case was the value of property foreclosed on by the payee of the check in an effort to satisfy the obligation of the drawer of the check. *See id.* The Indiana court held that the payor bank would be held accountable only for the amount of the check that had not been recovered by the payee through foreclosure. *See id.*

As one noted commentator on banking law has suggested, the approach of the Indiana court "seems sensible and [does not] conflict with the basic idea of 'strict liability' for the full amount of the check held too long." Clark & Clark, *supra,* § 6.02[2][n]. Unlike the broad use of equity employed by the *Starcraft* court to modify the strict liability concept, this mitigation concept does not require that payees prove actual loss. *See id.* Payor banks that hold checks longer than the midnight deadline remain strictly accountable for the value of the checks; at the same time, banks may avoid a double recovery by the payee if they can show that some or all of the debt underlying the check has been satisfied by its drawer. In this manner, we believe that Texas courts can conform to the strict liability structure of section 4.302 while still giving effect to Texas cases condemning double recovery of damages. *See, e.g., Stewart Title Guar. Co. v. Sterling,* 822 S.W.2d 1, 7 (Tex.1991).

■ In the present case, the Bank stipulated to the fact that it failed to return the checks to Plaintiffs by the midnight deadline. Assuming that the midnight deadline in fact governed liability under 4.302, the Bank is strictly accountable for the value of the checks. Equity cannot modify that responsibility. Nonetheless, the Bank properly raised equitable princi-

ples in determining the extent of that liability. Like the plaintiffs in *Meeker*, Plaintiffs here were able to mitigate the damages that they suffered when the checks were not paid. Specifically, Plaintiffs stipulated that funds garnered through mechanic's liens "fully satisfied the August 1996 invoices." Based on this stipulation, we believe the Bank conclusively established that further payments to Plaintiffs on the checks would violate equitable principles of unjust enrichment and double recovery. As a consequence, we hold that the trial court did not err in relying on equitable principles to grant the Bank's motion for summary judgment.

In summary, with respect to Plaintiffs' first and third issues, we hold that section 4.302 imposes strict liability on payor banks that fail to return checks by the midnight deadline, but that courts may consider equitable principles in determining whether payees have mitigated their damages. Thus, we conclude that the Bank was strictly accountable for the value of the checks that it failed to return by the midnight deadline. The trial court, however, properly acknowledged the role of equitable principles in determining the extent of the Bank's obligation. On the basis of Plaintiffs' stipulation that the August 1996 invoices for which the checks were originally tendered had been fully satisfied, the trial court properly concluded that equity did not require that the Bank pay those obligations a second time.

## CONCLUSION

Because the trial court properly exercised its equitable discretion to determine the amount of the Bank's liability under section 4.302, we affirm the trial court's orders granting the Bank's motions for summary judgment and denying Plaintiffs' motions.